UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

STARR A.,[1]

      Plaintiff,

v.                                    Civil Action No. 2:23-cv-460

MARTIN O'MALLEY,[2]
*Commissioner of Social Security*,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Starr A. seeks judicial review of the Commissioner of Social Security's denial of her claim for disability benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act. Specifically, Plaintiff alleges that the Commissioner's Administrative Law Judge ("ALJ") failed to account for limitations she experienced, and lacked sufficient medical evidence to support the limitations articulated in her residual functional capacity ("RFC"). She therefore contends the RFC finding is not supported by substantial evidence. This action was referred to the undersigned United States Magistrate Judge

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.
[2] Since the filing of the case, Martin O'Malley was appointed the Commissioner of Social Security. He is therefore automatically substituted as a party pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. This Report finds no error in the ALJ's assessment of the evidence and therefore recommends that the court deny Plaintiff's Motion for Summary Judgment, (ECF No. 10), and affirm the final decision of the Commissioner, (ECF No. 12).

## I.   **PROCEDURAL BACKGROUND**

On March 9, 2020, Plaintiff protectively filed for DIB and SSI. (R. 406-08). Plaintiff alleged disability beginning January 8, 2019, based on adjustment disorder, depression, anxiety, PTSD, lymphedema, foot pain, asthma, hypertension, back spasms, and carpal tunnel syndrome. Id. The state agency denied her application initially and on reconsideration. (R. 406-07, 430-31). Plaintiff requested an administrative hearing, which was held July 13, 2021, and at which Plaintiff was represented by counsel. (R. 336-73). An impartial vocational expert ("VE") testified. Id. During the hearing, Plaintiff amended her onset date to January 4, 2020. (R. 353, 372). On July 30, 2021, the ALJ denied Plaintiff's claims, finding she was not disabled during the period alleged. (R. 478-503). The Appeals Council remanded the case after determining the ALJ failed to consider an earlier administrative decision denying Plaintiff's 2019 claim for disability. (R. 510-12).

After remand, the ALJ held a second hearing, and heard additional testimony from Plaintiff and a different VE. (R. 374-98). The ALJ then issued a second decision again concluding Plaintiff was not disabled. (R. 307-27). The Appeals Council denied review, rendering this second decision final. (R. 1-4).

On September 15, 2023, Plaintiff filed her complaint in this court. Compl. (ECF No. 1). Plaintiff seeks judicial review of the Commissioner's final decision that she was not entitled to an award of DIB or SSI, claiming that the Commissioner's conclusions are "legally erroneous and without substantial evidence to support [them]." Id. at ¶ 9. Plaintiff argues that the case should be reversed or remanded because the ALJ improperly analyzed the medical record and opinion evidence, and failed to consider limitations shown by the medical evidence. Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Br.") (ECF No. 11, at 3). The Commissioner opposed Plaintiff's motion, arguing that substantial evidence supports the RFC, and that the ALJ properly weighed the medical opinions and other evidence in the record. Def.'s Brief Supp. Comm'r's Decision. ("Def.'s Brief") (ECF No. 12, at 1). Plaintiff filed no reply and the time for replying has now expired. After a review of the record, this Report considers each of these arguments.

3

## II.  FACTUAL BACKGROUND

**A.  Plaintiff's Treatment**

Plaintiff's arguments in this court do not require a complete review of her medical history as she disputes only the ALJ's assessment of her medical history and related opinion evidence since on, or around, January 4, 2020, her amended disability onset date.

### 1.  Medical Visits

On January 6, 2020, Plaintiff was evaluated at Tidewater Skin Care and Pathology PC for allergies and a "productive cough." (R. 1256, 1258-59). Plaintiff reported that "she was recently at a nightclub where multiple people were smoking, which 'set off her asthma.'" (R. 1259). On examination, Plaintiff was well-appearing, alert, and oriented. (R. 1258). That same day, Plaintiff had an appointment at RMG Warwick Medical and Professional Center ("RMG"). (R. 1293). Plaintiff complained of cold-like symptoms and depression, but noted that she sees a different doctor for her depression. Id. Plaintiff denied suicidal and homicidal ideations. Id.

On January 12, 2020, Plaintiff was seen at M.D. Express Hampton by PA Pamela Flavin-Lee for edema. (1290-91). Plaintiff reported swelling in her feet and right hand for the past three days. (1291). On examination, Plaintiff was "[n]egative for gait problem[s] and joint swelling." Id. (emphasis removed). PA

4

Flavin-Lee found "[n]o obvious edema of [Plaintiff's] upper or lower extremities," and her strength was intact and equal bilaterally. Id. PA Flavin-Lee noted that Plaintiff is obese, and recommended she start a "low sodium diet (less than 2000 mg per day), exercise as able," wear compression stockings, and elevate her legs when possible. (R. 1291-92). Plaintiff was given a "short course of lasix as [a] courtesy," and was advised that "she must get [her] future refills from" her primary care provider. (R. 1292).

The next day, Plaintiff had a new patient mental health evaluation at Commonwealth Clinical Consulting Services "for the purpose of receiving mental health skill-building services." (R. 1105-17). The provider observed that Plaintiff's "lack of healthy symptom management is having a significantly concerning impact on her daily functioning." (R. 1106). During the evaluation, Plaintiff "kept referring to herself as being 'sick' and wanting to be taken out of work." Id. Plaintiff described the following symptoms: "inability to adjust well to change, being severely depressed, high stress level, cries daily, lack of energy and motivation, a lot of anxiety coming from having to care for her daughter, and feeling as though she has to please everyone. Id. Plaintiff previously asked "her psychiatrist to complete documentation which conflicts with her ability to work or not." Id. She admitted that she "is not taking her medication as

prescribed and admitted to not following the schedule outlined by her psychiatrist." Id. Plaintiff described her activities of daily living, including waking up at 4:30 am, helping her daughter get ready for school, walking her dogs, and running errands. (R. 1107). Plaintiff stated that she "forgets to take her medications," forgets to eat, and "wakes up every hour even when she takes her night medications." Id. On examination, Plaintiff's mood, affect, and orientation were within normal limits, and her insight and judgment were fair. (R. 1111-12). Plaintiff was diagnosed with bipolar disorder, current episode manic, with psychotic features. (R. 1113). She was advised to participate in outpatient therapy and comply with her medication regimen. Id.

On February 3, 2020, Plaintiff returned to RMG for a follow-up appointment after her urgent care visit for edema, and was treated by Chaitali Panchal, M.D. (R. 1287). Plaintiff reported edema for the past two weeks in her bilateral feet and ankles. Id. She complained of "chronic feet pain and back pain," and reported that she was attending physical therapy "for her back pain and foot pain." Id. The treatment notes included that Plaintiff was previously "seen in vascular for leg edema, [and was] advised [about] compression stockings and other measures." Id. Dr. Panchal informed Plaintiff that "she should try [the] measures [] suggested." Id. On examination, Plaintiff did "not have leg edema." Id. Dr. Panchal provided Plaintiff with an

ambulatory referral for physical therapy, and instructed Plaintiff to engage in weight loss exercise and diet modification. (R. 1288-90).

Four days later, on February 7, 2020, Plaintiff was seen by PA Megan E. Cobb at RMC Hospital PBB Clinics for a reevaluation of her leg swelling. (R. 1283). Plaintiff stated "that she has noticed some swelling in her lower legs that has progressed over the past couple years," and is worse at night but "slightly better with elevation." Id. PA Cobb "[r]eiterated [the] importance of conservative measures to include daily application of compression garments, knee high." (R. 1286). PA Cobb provided Plaintiff with a prescription for fitted garments, and recommended Plaintiff "[g]radually increase activity . . . not only for weight loss, but to mechanically mobilize fluid." Id. PA Cobb gave Plaintiff a referral to physical therapy for her lymphedema. (R. 1287).

On February 11, 2020, Plaintiff attended physical therapy at In Motion Physical Therapy. (R. 1127). Plaintiff reported "back and foot pain with prolonged standing." Id. Plaintiff described bilateral low back and foot pain, and noted that she received a recent diagnosis of bilateral LE lymphedema. Id. Plaintiff stated that her symptoms began several months ago, and she rated her average pain a 7/10, but noted that the heaviness of her feet bothers her more than the pain. Id.

7

On February 12, 2020, Plaintiff had a follow-up appointment at RMC Hospital with NP Victorious N. White. (R. 1130). Plaintiff was "status post a lumbar epidural on December 18th [2019]." Id. Plaintiff reported a 95% improvement in her lower back pain for about one month following the injection, and her pain returned slowly. Id. Plaintiff stated that "the pain in her back is a constant throbbing pain," occurring "mainly on the left side." Id. She explained that the pain "can be constant[,] aching[,] and stabbing," and standing/walking makes the pain worse. Id. Plaintiff reported that the pain starts in her lower back and radiates down to her left leg and calf. Id. She described the pain down her legs as "more of a numbness . . . pain." Id. Plaintiff noted that she was recently diagnosed with lymphedema, but was not taking medications for her pain. Id. On examination, she was oriented, and had normal speech, behavior, thought content, and judgment. (R. 1133). Plaintiff was given another trigger point injection for her lumbar myofascial pain, and she was prescribed pain medications. Id.

On February 14, 2020, Plaintiff was examined for bilateral foot pain at Tidewater Orthopaedics by NP Sarah Flanigen. (R. 1683). NP Flanigen observed that Plaintiff has "bilateral plantar fasciitis and posterior tibial tendinitis with adult acquired flat foot." Id. NP Flanigen "again discussed the multiple etiology [] of her pain including lumbar radiculopathy, exacerbation of

chronic pain by depression, lymphedema, posterior tibial tendinitis, [and] plantar fasciitis." Id. NP Flanigen recommended Plaintiff continue physical therapy, and "again recommended use of custom orthotics for her persistent recalcitrant foot pain." Id. NP Flanigen continued Plaintiff "on topical anti-inflammatory which has improved her symptoms." Id. On examination, Plaintiff was in no acute distress, but had swelling in her right tibial tendon with pain. (R. 1684). Plaintiff's left ankle and heel were swollen and tender. Id.

On February 19, 2020, Plaintiff returned to RMG and was treated by Dr. Panchal. (R. 1460). Plaintiff reported flu-like symptoms. Id. On examination, Plaintiff was alert, in no acute distress, and her mood and behavior were normal. (R. 1460). The following month, on March 13, 2020, Plaintiff had a follow-up appointment with Dr. Panchal at RMG. (R. 1454). Dr. Panchal noted Plaintiff's statement that "she was diagnosed with lymphedema by vascular and wants form to be filled out [by RMG] for unemployment." Id. Plaintiff asked her vascular team to complete the form, but they refused. Id. On examination, Plaintiff was alert, in no acute distress, and did not display significant leg edema. (R. 1455). Plaintiff was neurologically unremarkable, and her behavior was normal. Id. Dr. Panchal refused to complete the unemployment paperwork because Plaintiff only had "lymphedema stage I." (R. 1274). Dr. Panchal informed Plaintiff "[t]hat her

back could be contributing to make her foot pain and swelling worse." Id. Dr. Panchal recommended Plaintiff "talk to orthopedics about the paperwork," and Plaintiff noted that she made an appointment elsewhere for assistance. Id.

On March 25, 2020, Plaintiff was treated by the emergency department at Sentara Careplex Hospital. (R. 1731). Plaintiff had a fracture in her left fibula following a fall. (R. 1731-32). Plaintiff was discharged with a "splint, pain medications, non-weight bearing instructions and directions to [follow-up] with ortho." (R. 1732).

On March 26, 2020, Plaintiff had an initial appointment at Riverside Commonwealth Family Practice. (R. 2406). Plaintiff was evaluated for edema. Id. On examination, Plaintiff had normal range of motion, no edema in her right lower leg, and 1+ edema in her left lower leg. (R. 2409-10). Plaintiff had normal behavior and thought content. (R. 2410). Plaintiff was diagnosed with prediabetes and prescribed medication. Id.

On March 30, 2020, Plaintiff had surgery to treat her left fibular fracture at Careplex Orthopaedic. (R. 1705). Paul Maloof, M.D., performed an open reduction and internal fixation of Plaintiff's left fibula. Id. Following surgery, Plaintiff was non-weightbearing for six weeks. (R. 1706).

In the spring of 2020,[3] Plaintiff underwent psychological testing at Genesis Counseling Center. (R. 1866). The testing was completed by Noelle Lowry, Ph.D., LCP. Id. Plaintiff was "referred by her In-home Skill Builder[4] for psychological testing in order to obtain a clearer diagnostic assessment of her current emotional, and behavioral functioning and to assist in treatment planning." Id. Dr. Lowry conducted two diagnostic interviews with Plaintiff and completed a psychological report. Id. During both sessions, Plaintiff was alert, oriented, cooperative, and friendly. Id. Plaintiff displayed adequate attention, concentration, and understanding of the exam procedures. Id. Her expressive and receptive language skills were normal, her thought processes were appropriate, her thought content was reality-based, and she displayed no evidence of hallucinations, delusions, obsessions, or suicidal ideation. Id. Plaintiff described "a history of abuse," including sexual abuse that began around the age of six years old and lasted two months. (R. 1867). Plaintiff also described a history of physical abuse. Id.

Based on the interviews and test results, Dr. Lowry concluded in a report, dated April 3, 2020, that Plaintiff had "Bipolar

---

[3] The psychological report from Genesis states that Plaintiff was evaluated on March 26, 2020, and May 12, 2020. (R. 1866). However, the report was completed on April 3, 2020. Id.

[4] During the psychological testing at Genesis, Plaintiff stated that she had a mental health crisis intervention in December, 2019, and since then, she has had an in-home skill builder. (R. 1867).

Disorder I, Current episode manic, with psychotic features, with anxious distress," and "Unspecified Trauma – and stressor-related disorder."  (R. 1869).

On April 14, 2020, Plaintiff had a telehealth appointment with Vascular & Transplant Specialist-Hampton ("VTS-H") for lymphedema.  (R. 1728-29).  The treatment notes included that Plaintiff's "main concern [was] getting approval for Social Security and unemployment."  (R. 1729).  Her provider stated that they could not complete disability paperwork for Plaintiff because they had not assessed her in-person and her diagnosis was uncertain.  Id.

Also on April 14, 2020, Plaintiff had an appointment at Genesis Counseling Center.  (R. 1937).  Plaintiff's chief complaint was sleep problems, and she reported increased depression related in part to wearing a cast after ankle surgery.  Id.  Plaintiff stated that she was experiencing visual and audio hallucinations. Id.  On examination, Plaintiff's thought processes were logical and relevant, and her thoughts were completed normally.  Id.  Her thought content was normal with no psychotic or suicidal thoughts, and her judgment was realistic with normal insight.  Id.  She exhibited normal memory, attention span, and concentration.  Id. Plaintiff was cleared to return to work and discontinue her FMLA leave.  (R. 1938).  Plaintiff stated that "her mental state is no longer the cause of her issues regarding employment."  Id.

Plaintiff was deemed psychiatrically fit for outpatient treatment. Id.

On May 8, 2020, Plaintiff had a six-week post-operative appointment for her ankle. (R. 2276). Plaintiff's leg cast was removed and she was advised to resume weight bearing gradually over the next three weeks. Id. By July 2020, Plaintiff had her left ankle syndesmotic screw removed, and she was "weightbearing in normal shoes" and her ankle strength was a 5/5. (R. 2272). Plaintiff's sensation was intact, and she walked without an antalgic gait. Id.

On October 20, 2020, Plaintiff had a follow-up appointment at RMC Hospital for her prediabetes and lymphedema. (R. 2359). The treatment notes included that Plaintiff had lost thirty-two (32) pounds since March with lifestyle change, and she was seeing a nutritionist once a month. Id. Plaintiff noted that she walks her dog two to three times a day. Id. On examination, Plaintiff was negative for fatigue, back pain, dizziness, and weakness. (R. 2362). She had a normal muscoskeletal range of motion, normal breath sounds, and her foot exam was normal bilaterally. (R. 2363). She was alert and oriented with appropriate mood and behavior. Id.

On October 24, 2020, Plaintiff had a psychiatrist appointment with Alicia Coles, LPC-Resident, in collaboration with Dr. Gomes, Ph.D. (R. 2127—28). The treatment notes included that Plaintiff's

speech was normal, her mood and affect were appropriate, her thought processes were logical and relevant, and her thought content was normal with no psychotic or suicidal thoughts. (R. 2127). Treatment notes from Plaintiff's therapy sessions through June, 2021, included similar findings. See (R. 2106, 2121, 2077, 2080).

On February 18, 2021, Plaintiff had trigger point injections to treat her lumbar pain complaints. (R. 2420). On April 21, 2020, treatment notes included that Plaintiff had gained about ten pounds since January, and she was no longer seeing a nutritionist. (R. 2332). Plaintiff was negative for fatigue, shortness of breath, dizziness, weakness, and sleep disturbance. (R. 2336). Plaintiff was not nervous or anxious. Id. On examination, Plaintiff had a normal muscoskeletal range of motion, normal reflexes, and her behavior and thought content were normal. (R. 2337).

On April 21, 2021, Plaintiff had a follow-up appointment for plantar fasciitis of the left foot at RMC Hospital. (R. 2332). The treatment notes include that Plaintiff had gained approximately ten pounds since January, and she was no longer seeing a nutritionist. Id. On examination, she was negative for fatigue, dizziness, weakness, and sleep disturbance. (R. 2336).

On January 27, 2022, Plaintiff went to Sentara Family and Internal Medicine-Yorktown and complained of excessive sweating.

14

(R. 2545).   The treatment notes included that Plaintiff's hypertension was not controlled, and her medication was adjusted. (R. 2549).   Plaintiff's lymphedema, asthma, and bipolar disorder were stable.   Id.   Plaintiff was negative for fatigue, shortness of breath, dizziness, and headaches.   (R. 2550-51).   On examination, Plaintiff was in no acute distress, her pulmonary effort and breath sounds were normal, she had a normal muscoskeletal range of motion, and she had no edema in her legs. (R. 2554).   She had no neurological deficits, she was alert, and her mood, thought content, and judgment were normal.   Id.

On February 8, 2022, Plaintiff returned to therapy with LPC-Resident Coles and Dr. Gomes.   (R. 2477-78).   Plaintiff stated that she recently joined a gym and was going every day to control her weight.   (R. 2478).   Plaintiff complained that she was unable to focus.   Id.   However, on examination, Plaintiff was fully oriented, and she exhibited normal memory, attention span, and concentration.   Id.   Her exam results remained the same at other appointments that month and through April.   (R. 2436, 2438, 2440, 2442, 2444, 2446, 2449, 2453, 2455, 2458, 2461, 2463, 2465, 2467, 2469, 2471, 2474, 2476).   Plaintiff continued to go to the gym daily and workout with a trainer.   (R. 2463).

On February 25, 2022, Plaintiff had a follow-up appointment at Sentara Family and Internal Medicine for hypertension and new headaches.   (R. 2533).   The provider increased Plaintiff's

medication and noted that she was unable to determine if Plaintiff's headaches were related to her hypertension. Id.; (R. 2536). Plaintiff denied neurological symptoms such as loss of vision or weakness, and denied experiencing shortness of breath or edema. (R. 2537). On examination, her mood and thought content were normal, and she was in no respiratory distress. (R. 2539).

At a follow-up appointment on March 29, 2022, Plaintiff's hypertension was well-controlled with medication. (R. 2523). Plaintiff also reported that her headaches and dizziness resolved with improvements to her blood pressure. Id. On examination, she was in no acute distress, her pulmonary effort and breath sounds were normal, her muscoskeletal findings were unremarkable, and she was alert, with normal mood and though content. (R. 2527).

## 2.  Medical Source Statement

On May 27, 2021, a medical source with an illegible signature completed a mental RFC assessment on Plaintiff's behalf. (R. 2073-74). The report was completed on a checkbox form listing certain questions about Plaintiff's work capabilities. Id. The form contains four primary categories: (1) understanding and memory; (2) sustained concentration and persistence; (3) social interaction; and (4) adaptation. Id.

In the first category-understanding and memory-the provider found that Plaintiff has moderate limitations in her ability to remember locations, work-like procedures, and very short and

simple instructions. (R. 2073). The provider concluded that Plaintiff is markedly limited in her ability to understand and remember detailed instructions. Id. Regarding sustained concentration and persistence, the provider concluded that Plaintiff has moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, and make simple work-related decisions. Id. The provider found that Plaintiff is markedly limited in her ability to complete a normal-work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 2073-74). For the third and fourth categories, social and adaptation limitations, the provider found some moderate limitations, but no marked limitations. (R. 2074). The provider did not provide an explanation for his/her conclusions. (R. 2073-74).

**B.   Opinion Testimony**

    **1.   State Agency Physicians**

During her initial agency evaluation in May, 2020, Richard Surrusco, M.D., reviewed the medical record and opined that Plaintiff could perform light work with the following limitations:

Plaintiff could lift and carry twenty (20) pounds occasionally, ten (10) pounds frequently, stand and walk for four hours in an eight-hour workday, and sit for six hours during a workday. (R. 415). He found that Plaintiff had few postural limitations and no environmental, visual, or communicative restrictions. Id.

Also, as part of Plaintiff's initial determination, state agency psychiatric consultant, Andrew Bockner, M.D., reviewed Plaintiff's medical records and formulated a mental RFC assessment. (R. 416-17). Dr. Bockner found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions but was not significantly limited in her ability to remember locations and work-like procedures, and in her ability to understand and remember very short and simple instructions. (R. 416). Dr. Bockner found that Plaintiff has some sustained concentration and persistence limitations, and noted she was moderately limited in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Id. Dr. Bockner found that Plaintiff was not significantly limited in her ability to maintain attention and concentration for extended periods, sustain an ordinary work

routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and in making simple work-related decisions. Id. Dr. Bockner concluded that Plaintiff has no social interaction or adaptation limitations. (R. 416-17).

On reconsideration in May 2020, William Rutherford, Jr., M.D., essentially echoed Dr. Surrusco's findings but concluded Plaintiff would have environmental restrictions, including avoiding extreme temperatures, vibration, fumes, poor ventilation, and machinery hazards. (R. 439-40). Otherwise, he found she could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, sit for six hours in an eight hour workday, and stand/walk for four hours of a workday. (R. 439). Dr. Rutherford concluded Plaintiff could occasionally stoop, kneel, crouch, crawl, or climb ramps or stairs, ladders, ropes or scaffolds. Id. He attributed some postural and exertional limitations. Id.

Also at the reconsideration stage, state agency reviewing psychiatric consultant, Leslie Montgomery, Ph.D., reviewed Plaintiff's medical record. (R. 440-41). Dr. Montgomery generally agreed with Dr. Bockner's findings regarding Plaintiff's mental abilities, but found Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods. (R. 441).

C.   **Testimony Before the ALJ**

Plaintiff testified during both administrative hearings.  The first hearing was on July 13, 2021, and the second hearing was held on May 5, 2022.  (R. 336-398, 304-334).  A different impartial vocational expert testified at each hearing.  See id.

1.   **Plaintiff's Testimony**

During Plaintiff's first administrative hearing, and on direct questioning by the ALJ, Plaintiff testified that she is unable to return to work because she has "a lot of illness."  (R. 344).  Plaintiff stated that she has "a lot of stuff that's going on as far as [her] mental status," including insomnia and adjusted emotional disorder, for which she takes different "very strong" medications.  (R. 344-45).  Plaintiff also reported anxiety and panic attacks.  (R. 345).

The ALJ then turned to Plaintiff's work history and reviewed her past employment.  Id.  Plaintiff testified that her last job was at Walmart, where she worked as a self-checkout host, stood during her shifts, and was lifting "about 25 pounds.".  Id.  Plaintiff noted that her mental health doctor took her out of work in January, 2020, because her "anxiety and depression had gotten worse," and she was having "panic attacks and anxiety attacks." (R. 363).  Plaintiff was permitted to return to work, but she testified that she ultimately left "Walmart because it was just really taking a toll on [her] . . . mental health."  (R. 364).

Plaintiff testified that she had trouble getting up in the morning, was "exhausted . . . from not getting enough sleep," and was unable "to function at home." Id. The ALJ asked Plaintiff if her depression and anxiety have improved since leaving Walmart, and Plaintiff stated that she still has "the issues," and she is "not able to perform the [job] tasks anymore, not just with the standing but [] [her] mental health has taken a toll on [her]," and she is not stable. Id. Plaintiff testified that she receives mental health treatment once a month, and her doctor is "trying different medications to see if she can help" Plaintiff become stable. (R. 365). Plaintiff stated that she has "a lot of side effects," from her medications including insomnia, overeating, drowsiness, "dizziness, headaches," and she is unable to drive while taking some of her medications. (R. 365–67). Plaintiff also testified that she has back spasms and receives injections every six months. (R. 369).

Before working at Walmart, Plaintiff worked at Aspen Cleaning for "about two months," and her job duties included vacuuming, wiping tables, and lifting/carrying "about 15 pounds." (R. 346). Plaintiff also worked as a medical/front desk assistant for "Dr. Murphy." Id. Plaintiff would check-in patients, take blood pressure measurements, and sometimes handle patient checkout. Id. Plaintiff testified that she worked as a caretaker for Grace Homecare, and helped patients at their homes with activities of

daily living. (R. 347-48). Plaintiff stated that she lifted "no more than 15 pounds," and she remained at this job for "over two or three months." Id. Plaintiff also worked at Production System Services, which was actually "Cannon, a camera place." (R. 348). Plaintiff handled customer returns, and for a short period of time, created estimates for camera repairs. (R. 348-49). Plaintiff noted that her duties included lifting about 25 pounds and standing while working. Id. Additionally, Plaintiff worked at Peninsula Cleaning, Cape Cleaning, and Premier Building Maintenance, which all involved similar work to her position at Aspen Cleaning. (R. 349-50). Finally, Plaintiff testified that she worked at Sarach Systems in a warehouse. (R. 350). The ALJ asked Plaintiff if she had worked at Calipher Support Services and Westaff USA—which were included on her employment history—but Plaintiff could not recall. Id.

Regarding her additional health issues, Plaintiff testified that she broke her "fibula or tibia," and is "unable to walk for a long time or stand for a long time." (R. 369). Plaintiff stated she can stand or walk for "less than an hour," before her foot "gets stiff and," she is "not able to move because [her] foot swells." Id. Plaintiff found out she had lymphedema "while working at Walmart," and her legs and feet would swell. Id. Plaintiff stated that she uses a machine every other day during the week that helps "compress the fluid out." (R. 369—70).

Plaintiff noted that when she experiences swelling on non-treatment days, she has "to lay down." (R. 370).

At the second administrative hearing on May 5, 2022, Plaintiff testified that she was still experiencing depression and remains in "a dark room," most of her time. (R. 383). Plaintiff stated that her neighbor comes to her home and helps her. Id. Plaintiff noted that she is no longer able to go to the grocery store, and her daughter no longer lives with her. (R. 384). She stated that her lymphedema causes her legs to swell when she stands for long periods, and she cannot go to the gym because of her lymphedema. (R. 385). Plaintiff reiterated that she uses a machine at home to treat her swelling. (R. 390-91).

## 2. Testimony from the VE

At Plaintiff's first administrative hearing, the VE characterized Plaintiff's prior work as (1) medical assistant, (2) floor cashier, (3) commercial cleaner, (4) home cleaner or home housekeeper, (5) home health caregiver, and (6) return clerk. (R. 355-56).

The ALJ then presented the VE with a hypothetical, and posited a person with the same age, education, and work experience as Plaintiff with the following limitations:

> The individual would have frequent balancing, occasional stooping, crouching, crawling, kneeling and climbing but never on ladders, ropes or scaffolds. The individual would be limited to frequent pushing and pulling with the lower extremities. And the individual would be

> limited to frequent exposure to temperature extremes of cold and heat, humidity, vibrations, fumes, odors, dust, gases and poor ventilation and hazards including moving machinery and unprotected heights, can do simple, routine tasks but no complex tasks. Would the individual be able to perform any of the past work as actually performed or generally performed?

(R. 358-59). The VE testified that this person could not perform any of Plaintiff's past work. (R. 359). But, the VE concluded that the person could perform jobs in the national economy with "light exertional activity that is unskilled." Id. The VE testified that the following jobs in the national economy would be available to such a person: inspector and hand packager, (DOT 559.687-074), with 15,000 jobs nationally; plastic medical products assembler, (DOT 712.687-010), with approximately 14,000 jobs nationally; and marker or ticketer, (DOT 209.587-034), with 90,000 jobs nationally. Id.

The ALJ then asked if the hypothetical person was further limited to "frequent interaction with coworkers and supervisors and occasional interaction with the public would that have any effect on those positions?" Id. The VE testified that it would not. Id. The ALJ asked the VE if the individual could perform these positions if he or she was limited to four hours of standing/walking in an eight-hour work day, "and each interval of standing would [be] at one hour each time." (R. 360). The VE testified that this individual "would be downgraded to sedentary work," but could still perform unskilled work. Id. The VE stated

that the person could work as a general office worker, for example, a document preparer, (DOT 249.587-018), with 20,000 jobs nationally. Id. The VE also noted that the person could work as a production worker, including as a final assembler, (DOT 713.687-018), with 9,000 jobs nationally, and stuffer, (DOT 731.685-014), with 7,000 jobs nationally. (R. 361). The VE testified that if the person was off task 15% of the time and/or consistently missing two days a month, that would preclude "all competitive employment." Id.;(R. 362).[5]

During the second hearing, the VE testified that if the hypothetical person's RFC was lowered to sedentary work, they could still perform jobs in the national economy. (R. 395). These jobs include eyeglass polisher, (DOT 713.684-038), with 1,900 jobs nationally, addresser, (DOT 209.587-010), with 2,700 jobs nationally, and nut sorter, (DOT 519.687-086), with 2,000 jobs nationally. (R. 395-96).

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42

---

[5] At the second administrative hearing, the VE echoed the findings made during the first hearing. (R. 391-97).

U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   ANALYSIS

In her motion for summary judgment, Plaintiff raises five overlapping arguments in support of a remand.   Specifically, Plaintiff contends that the ALJ:

> 1. Failed to consider Plaintiff's mental limitations, specifically her off task limitations, in the RFC;
>
> 2. Failed to twice to consider substantial and probative evidence within the record and instead cherry-picked the evidence to support a desired outcome;
>
> 3. Failed to consider the side effects of the medications on Plaintiff's ability to work;
>
> 4. Failed to properly perform a function-by-function analysis pursuant to Mascio v. Colvin, 780 F.3d 632 (4th Cir.);
>
> 5. Failed to satisfactorily explained her decision to discredit portions of Plaintiff's consistent testimony regarding her symptoms and functional limitations from her physical and mental impairments, particularly regarding the combined impact of her impairments.

See Pl.'s Br. (ECF No. 11, at 1—24).   The Commissioner argues that the ALJ properly evaluated Plaintiff's mental limitations, including her ability to stay on task, sufficiently considered the entire record, including the effect of Plaintiff's obesity on her other impairments, properly considered Plaintiff's medication side effects, performed an adequate function-by-function analysis, and properly evaluated Plaintiff's subjective claims. Def.'s Br. (ECF No. 12, at 17—30).   As set forth below, after review, I find the ALJ complied with the rules and her explanation and citation to the medical record are sufficient to satisfy the substantial

evidence test. Accordingly, this Report recommends the court affirm the Commissioner's final decision.

## A.    Framework for Social Security Act Disability Evaluation

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d). As relevant here, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); accord 20 C.F.R. § 404.1505(a). An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

Social Security Administration regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 404.1520(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3. Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4. Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5. Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled.  An affirmative answer to questions three or five establishes disability.  The claimant bears the burden of proof during the first four steps; if the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The Social Security Administration considers all material evidence in evaluating whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(3); 404.1520b.  This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence

of pain and disability; and (4) the claimant's educational
background, work history, and present age." Jolly, 2017 WL
3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th
Cir. 1967)). Ultimate responsibility for making factual findings
and weighing the evidence rests with the ALJ. Hays, 907 F.2d at
1456 (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B. The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in
substantial gainful activity since January 4, 2020, her amended
alleged onset date. (R. 310—11). At step two, the ALJ found that
Plaintiff suffered from the following severe impairments: "lumbar
degenerative disc disease, facet arthropathy, and chronic pain
syndrome status pos[t] ORIF [open reduction-internal fixation]
left fibular fracture; asthma; morbid obesity; lymphedema (stage
1); bipolar disorder; adjustment disorder; anxiety disorder, and
post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c) and
416.920(c))." (R. 311) (emphasis removed). At step three, the
ALJ found that Plaintiff did not suffer from a listed impairment
or combinations of impairments that met or medically equaled the
severity of one of the listed impairments. (R. 312). The ALJ
then developed a finding regarding Plaintiff's RFC. She determined
Plaintiff was able to perform light work as defined in 20 C.F.R.
§§ 404.1567(b) and 416.967(b) with the following additional
limits:

> There are no limits on the claimant's ability to sit,
> however, standing and walking is limited to a total of
> 4 hours, with each interval of standing being up to 1
> hour, and walking being up to 20 minutes, with the
> claimant not off task when changing positions.
> Additionally, the claimant is limited to no more than
> frequent balancing, and occasional stooping, crouching,
> crawling, kneeling, and climbing, but she may never
> climb on ladders, ropes, or scaffolds. Further, she is
> limited to no more than occasional pushing and pulling
> with the lower extremities including foot controls.
> Also, she is limited to frequent exposure to temperature
> extremes of cold and heat, humidity, vibrations, fumes,
> odors, dusts, gases, poor ventilation, and hazards,
> including dangerous moving machinery and unprotected
> heights. Finally, the claimant can do simple routine
> repetitive tasks, but no complex tasks, in a low stress
> work environment defined as occasional decision making
> and occasional changes in work setting, and have
> frequent interaction with coworkers and supervisors, and
> occasional interaction with the public.

(R. 318). At step four, the ALJ concluded that Plaintiff could

not perform any of her past relevant work. (R. 324). At step

five, the ALJ found that "[c]onsidering the claimant's age [36

years old on the amended disability onset date], work experience,

and residual functions capacity," there were other jobs in the

national economy Plaintiff could perform, including office helper,

with 13,000 jobs nationally, assembler-electrical accessories,

with 9,000 jobs nationally, and order caller, with 13,000 jobs

nationally. (R. 326). The ALJ thus found that Plaintiff was not

disabled from her alleged amended onset date of January 4, 2020,

through the date of the decision. (R. 327).

C.   **The ALJ's RFC Finding is Supported by Substantial Evidence**

Plaintiff raises five arguments in support of a reversal and remand.  I consider each argument below.

1.   **The ALJ properly evaluated Plaintiff's mental limitations, including her off-task limitations, when crafting the RFC.**

Plaintiff alleges that the ALJ erred in crafting the RFC because she found a moderate limitation in concentrating, persisting, or maintaining pace ("CPP"), but failed to account for her time-off task in the RFC as required by the Fourth Circuit's decision in Mascio.  Pl.'s Br. (ECF No. 11, at 8).  In response, the Commissioner argues that the ALJ "thoroughly discussed the record evidence, which indicated Plaintiff would not require time off task beyond that normally permitted an employee."  Def.'s Br. (ECF No. 12, at 17).  I agree with the Commissioner.

The ALJ's finding of moderate limitations in CPP does not mean that he found Plaintiff was moderately limited in concentrating, persisting, and maintaining pace.  The ALJ's finding merely means that Plaintiff was moderately limited in at least one of these areas. See Lockett v. Saul, 834 F. App'x 236, 239 (7th Cir. 2020) ("A moderate rating in maintaining concentration, persistence, and pace means the claimant is so limited in at least one of those areas, not necessarily all three."); 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(F)(3)(f) ("We will document the rating of limitation of the whole area of

mental functioning, not each individual part ... For example ... if you have marked limitation in maintaining pace, and mild or moderate limitations in concentrating and persisting, we will find that you have marked limitation in the whole paragraph B3 area of mental functioning."). Plaintiff "cannot show a need for pace-specific restrictions in [her] residual functional capacity simply because of the 'moderate' designation; [she] must have evidence of that need." Lockett, 843 App'x at 239.

Plaintiff further argues that the Fourth Circuit in Mascio established that when an ALJ finds a moderate impairment in CPP, an "RFC that limits a claimant to short, simple instructions and simple, routine, repetitive work does not account for a claimant's time off-task or limitations." Pl.'s Br. (ECF No. 11, at 8). However, the Fourth Circuit has "not impose[d] a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020). The ALJ need only "explain why a claimant's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in the claimant's RFC." Id. (cleaned up); see also Sizemore v. Berryhill, 878 F.3d 72 (finding that the ALJ properly explained why a pace limitation was not included in the RFC, despite including a moderate limitation in concentration, persistence, or pace). As demonstrated below, the ALJ discussed

33

the basis for the RFC in detail, and her discussion explains why Plaintiff would not require a limitation specifically directed to pace.

Here, the ALJ's discussion illustrates that the moderate CPP limitation was not based on pace, but rather was crafted to accommodate her limitations in concentration and persistence:

> The claimant testified, and noted in her function report, that she has difficulty concentrating and focusing. She also alleges she had difficulty being consistent (Hearing Record 5/5/22, Exhibit C3E). Further, the mental assessment completed by the providers whose signature is illegible in May of 2021, notes a marked limitation in the claimant's ability to complete a normal workday and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods (Exhibit C24F). Despite the foregoing, the claimant is able to care for her personal needs independently, care for her daughter, take care of her dogs, prepare simple meals, do light housework, drive, shop in stores, manage money, color, watch television, and spend time with family and friends (Exhibit C3E, C6F/3). Also, the claimant's memory noted on examinations throughout the longitudinal record, reflect it was consistently intact (Exhibits C14F/19, C19F, C20F, C25F, C30F). In addition, Dr. Andrew Bockner and Dr. Leslie Montgomery reviewed the file and found a moderate limitation in this area (Exhibits C4A, C5A, C8A, C9A). Moreover, the opinion rendered by the provider whose signature is illegible in May of 2021, noted moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, to perform activities within a schedule, to work in coordination with or proximity to others without being distracted, and to make simple work-related decisions (Exhibit C24F). Therefore, considering the claimant's testimony, actual level of activity, and giving the claimant every benefit of the doubt as supported by the record, the undersigned finds no more than a moderate limitation in concentrating, persisting, or maintaining pace.

(R. 316).  The ALJ also found the checkbox assessment—which supported a limitation in pace—only partially persuasive, and explained that to the extent the checkbox assessment "reflects greater limitations than those outlined in the residual functional capacity," those findings "are not consistent with the longitudinal record which reflects conservative mental health treatment, with mental status findings of no more than mild to moderate, with many findings noted consistently as unremarkable." (R. 323).[6]

Although the ALJ found Plaintiff moderately limited in CPP at step 2, she sufficiently explained why that determination does not "translate into" a specific pace limitation in the RFC. Shinaberry, 952 F.3d at 121.  Unlike in Mascio, where the Court granted remand "because the ALJ [t]here gave no explanation" for ignoring the plaintiff's moderate limitations in CPP, here, the ALJ did not find Plaintiff specifically limited in pace, nor did she fail to address the evidence unfavorable to her decision.  780 F.3d at 638; (R. 323).  The ALJ specifically accounted for potential ongoing issues in the RFC, and her reasons why those

---

[6] Although the medical source statement has never been attributed to any named provider, the ALJ nonetheless considered it as evidence, "presuming it to be an acceptable medical source." (R. 323).  The ALJ also found the opinions of Dr. Surrusco, Dr. Rutherford, Dr. Bockner, and Dr. Montgomery "partially persuasive," but concluded that the doctors did not provide enough limitations based on Plaintiff's record.  (R. 323-24).

limitations were imposed is sufficient to permit judicial review.[7]
See Owens v. Kijakazi, 2021 WL 2344224, at *3 (4th Cir. Mar. 3,
2023).

## 2    The ALJ did not Cherry-Pick or Mischaracterize the Evidence.

Plaintiff argues that the ALJ "failed, twice, to consider
substantial and probative evidence within the record and instead
cherry-picked the evidence to support a desired outcome. Pl.'s
Br. (ECF No. 11, at 10) (emphasis removed). Although Plaintiff
alleges two errors, her brief only identifies one—the ALJ failed
to address the effect of her obesity on her other conditions. Id.
at 10—14.[8]  The Commissioner contends that the ALJ "more than
satisfied her duty to discuss Plaintiff's obesity and considered
how it affected her other physical impairments throughout the
decision." Def.'s Br. (ECF No. 12, at 20). I agree.

In determining whether a party meets the requirements of a
listing, ALJs must consider not only whether the requirements of

---

[7] It bears mention that the ALJ did impose a fairly restrictive RFC which
accommodated Plaintiff's mental limitations to the extent they were
supported by evidence. The ALJ found that plaintiff can "perform light
work as defined in 20 CRF 404.1567(b) and 416.967(b)," but specifically
limited Plaintiff to "simple routine repetitive tasks, but no complex
tasks, in a low stress work environment defined as occasional decision
making and occasional changes in work setting." (R. 318).

[8] Plaintiff's brief includes that "the ALJ ignored several pieces of
evidence, including medical records, in concluding that Mr. Mitchell is
not disabled." Pl.'s Br. (ECF No. 11, at 11). Although Plaintiff is
not Mr. Mitchell, the court considers this argument, and finds no error
in the ALJ's analysis.

the listing are met, but if there is an impairment that when combined meets the requirements of a listing. 20 C.F.R. §§ 404.1520, 416.920. Here, at step two, the ALJ found that Plaintiff's obesity was severe. (R. 311). When crafting her RFC, the ALJ explicitly cited SSR 19-2p, explaining that it "requires an Administrative Law Judge to consider obesity in determining whether claimants have medically determinable impairments that are severe, whether those impairments meet or equal and listing, and, finally in determining the residual functional capacity." (R. 320). The ALJ found that Plaintiff BMI (body mass index) "is in the range that indicates obesity," and thus the ALJ, "in accordance with SSR 19-2p," considered "the cumulative effects of obesity . . . at each stage of this analysis." Id. The ALJ then evaluated the record, and explained how the RFC accounted for Plaintiff's physical limitations, including obesity. See (R. 320—22).

Plaintiff insists that the ALJ "cherry picked the evidence, concluded that none of the impairments resulted in an impairment, and failed to provide a rationale as to whether the combination of the impairments render her disabled." Pl.'s Br. (ECF No. 11, at 12). Cherry-picking occurs when an ALJ focuses on "a single treatment note that purportedly undermines [the source's] overall assessment of [the plaintiffs] functional limitations . . . ." Hudson v. Colvin, No. 12-cv-269, 2013 U.S. Dist. LEXIS 179614,

2013 WL 6839672, at *8 (E.D.N.C. Dec. 23, 2013) (quoting Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011)).

Here, the ALJ highlighted various treatment notes demonstrating that Plaintiff's "physical impairments did not warrant additional RFC limitations, including when in combination with Plaintiff's obesity." Def.'s Br. (ECF No. 12, at 22) (citing R. 322). For example, the ALJ observed that "while there is a lumbar MRI[9] which reflects some abnormalities, and the claimant received injections for her back pain, physical examination findings reflect no reduced lumbar range of motion, no atrophy of her legs, no positive straight leg raise tests, and no antalgic gate during the relevant time."[10] (R. 321). Also, the ALJ noted that "relevant to her fibula, by July of 2020, the claimant is fully weight bearing in regular shoes, does not use any assistive devices to ambulate, and has a normal gait." Id. Considering Plaintiff's lymphedema, the ALJ noted "there were some examinations which noted the swelling in her bilateral lower extremities," but "these findings were not consistent," and "no examination noted swelling in her arms." Id. The ALJ observed

---

[9] Plaintiff had a lumbar MRI on July 15, 2019, that revealed "[m]ild multilevel degenerative changes of the lumbar spine . . . without significant canal stenosis or neural foraminal narrowing." (R. 1302).
[10] The ALJ noted that she was "aware of the brief period where the claimant's gait was altered from her fall in March 2020, when she sustained a fractured left fibula." (R. 321, n.3).

that "the longitudinal record reflects that her asthma was generally stable." Id.

In contrast with the ALJ's careful citation to the record, Plaintiff's brief fails to cite a single medical record alleged to have been overlooked. She argues generally that the ALJ failed to consider "substantial and probative evidence within the record," but cites only the ALJ's opinion to support her claim that the "combination of these multiple impairments" demonstrates disability. Pl.'s Br. (ECF No. 11, at 12) (citing R. 311). In the same section, Plaintiff's brief—perhaps mistakenly—concedes "[h]ere there is a dearth of medical information demonstrating that Plaintiff has severe physical and mental impairments." Id.

Finally, considering "the claimant's obesity, the ALJ found that "the record does not support more than the exertional, postural, and environmental limitations outlined, especially when three providers who were approached to fill out disability paperwork for the claimant relative to her lymphedema, refused to complete the same." (R. 322) (citing R. 1274) ("Explained to patient that we could not fill out the paperwork for lymphedema state 1.")). As described above, the ALJ properly considered the impact of Plaintiff's obesity throughout her decision.

3.   **The ALJ Properly Considered Plaintiff's Medical Side Effects.**

Plaintiff next argues that the ALJ failed to consider her medication side effects on her ability to work.  Pl.'s Br. (ECF No. 11, at 14—16).  In determining a claimant's RFC, the ALJ must consider all the evidence in the record, including the possible side effects of any treatment.  SSR 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184, at *5 (July 2, 1996).  But the ALJ's decision does not have to refer to every piece of evidence in the record.  Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014).

The fact that the ALJ's decision does not explicitly discuss Plaintiff's alleged side effects is not fatal.  SSR 96-8p, 1996 SSR LEXIS 5 contains a lengthy list of factors which the ALJ "must" consider in formulating an RFC, any number of which are likely to be relevant in most cases yet go unremarked.  The ALJ stated that she considered the entire record, and this court should not disregard that statement absent evidence to the contrary.  Reid, 769 F.3d at 865 (citing Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter")).

Here, the record does not establish that Plaintiff's side effects have any significant impact on her RFC or ability to work.  Plaintiff's only supporting citations point to her subjective

statements and the "use and discontinued use of her medications."
Pl.'s Br. (ECF No. 11, at 15) ("Plaintiff credibly testified that
the medication causes her to be fatigue, dizzy and that sometimes
all she can [do] is go to sleep."). Accordingly, this Report finds
no error in the ALJ's consideration of Plaintiff's medication side
effects.

### 4. The ALJ Properly Performed a Function-by-Function Analysis

Plaintiff's fourth argument alleges that the ALJ erred by
failing to perform a function-by-function analysis as required by
Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). Pl.'s Br. (ECF
No. 11, at 16—17). Specifically, Plaintiff argues that the ALJ
"erred in expressing Plaintiff's RFC first, and only then
concluding the limitations caused by her impairments were
consistent with the RFC." Id. Plaintiff alleges that this "error
is most concerning regarding Plaintiff's severe impairments of her
diagnosed lymphedema and mental conditions, and her documented
symptoms of difficulty concentrating and difficulty following
directions." Id. Plaintiff contends that "the ALJ here never
properly determined the extent to which Plaintiff's mental
impairments, difficulty concentrating, and difficulty following
directions affect her ability to maintain employment, the Court is
unable to determine whether the hypothetical questions posed to

41

the VE included all of Plaintiff's functional limitations." <u>Id.</u> at 16.

In response, the Commissioner argues that the "ALJ thoroughly discussed the evidence in the record regarding Plaintiff's impairments and explained why she assigned certain RFC limitations to accommodate the symptoms arising from those impairments." Def.'s Br. (ECF No. 12, at 27). The Commissioner argues that the ALJ appropriately provided a narrative discussion of the evidence that supports the RFC determination and fully accounted for Plaintiff's functional limitations stemming from her mental and physical impairments. <u>Id.</u> at 26—27.

After step three of the sequential analysis, the ALJ must determine the claimant's RFC. § 404.1520(a)(4). RFC is defined as "the most" a claimant "can still do despite [his or her] limitations." § 404.1545(a)(1). In making the RFC determination, the ALJ must consider "all the relevant medical and other evidence" in the record and incorporate any impairments supported by objective medical evidence, and those impairments based on the claimant's credible complaints. § 404.1545(a)(3); <u>Mascio v. Colvin</u>, 780 F.3d 632, 635 (4th Cir. 2015) (citing SSR 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184 (July 2, 1996)).

In <u>Mascio v. Colvin</u>, the Fourth Circuit held that the ALJ's "residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his

or her work-related abilities on a function-by-function basis,'" and "only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." 780 F.3d 632, 636 (4th Cir. 2015) (quoting Social Security Ruling 96-8p, 1996 SSR LEXIS 5, 61 Fed. Reg. 34,474, 34,475 (July 2, 1996)). Additionally, the Fourth Circuit noted that "the residual functional capacity 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence.' Id. (quoting Social Security Ruling 96-8p, 1996 SSR LEXIS 5). When the ALJ does not perform an explicit function-by-function analysis, "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ properly examined the evidence in the record, and performed a function-by-function analysis, discussing the evidence and the weight she gave to the evidence.

With regard to Plaintiff's mental impairments, the ALJ discussed Plaintiff's own testimony at both hearings, the medical evidence of record, and the medical opinion evidence. (R. 322-24). Specifically, "[t]urning to claimant's mental limitations,"

the ALJ found that her "treatment reflects no more than mild to moderate finings, with many noted consistently unremarkable. (R. 322). The ALJ observed that Plaintiff reported "some audio and visual hallucinations, and testified to thoughts of self-harm, and harm of others, [but] there is no mention during the relevant times of these findings when she was seen by her mental health providers." Id. In addition to her treatment notes, the ALJ observed that Plaintiff performed various activities of daily living, including attending online school, caring for her daughter and sister's daughter, driving, and interacting socially (including attending a night club). Id. Based on this information, the ALJ concluded that "the record does not support additional mental limitations than those outlined." Id. The ALJ also fully reviewed the medical opinion evidence and prior administrative medical findings. (R. 322-24).

With respect to Plaintiff's ability to concentrate and follow instructions, the ALJ considered Plaintiff's symptoms and explained how the RFC accounted for these symptoms. (R. 316, 324). The ALJ noted that in Plaintiff's function report, she alleged "difficulty concentrating[,] []focusing," and being consistent. (R. 316). However, the ALJ observed that Plaintiff's "memory noted on examinations throughout the longitudinal record, reflect it was consistently intact," and "Dr. Andrew Bockner and Dr. Leslie Montgomery reviewed the file and found a moderate limitation in

this area." Id.  Further, the ALJ reiterated that "the opinion rendered by the provider whose signature is illegible in May of 2021, noted moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, to perform activities within a schedule, to work in coordination with or proximity to others without being distracted, and to make simple work-related decisions." Id.  The ALJ specifically found that the opinions limiting Plaintiff "to simple, routine tasks," were "consistent with the longitudinal record, which reflects complaints of difficulty focusing and concentrating." (R. 324).

Additionally, to account for Plaintiff's ability to follow instructions, the ALJ limited Plaintiff to simple, routine, and repetitive tasks with no complex tasks, and only occasional decision making and changes in work setting.  (R. 318).  In reaching this finding, the ALJ noted that Plaintiff's memory was consistently intact, and Dr. Bockner and Dr. Montgomery found Plaintiff was not limited in her ability to understand, remember, and carry out very short and simple instruction.  (R. 324, 416, 441).

Unlike the plaintiff in Mascio, Plaintiff's RFC included specific limitations to accommodate her mental impairments:

> Regardless of the foregoing and giving the claimant every benefit of the doubt as supported by the record with respect to her physical and mental impairments, the

45

> residual functional capacity above accommodates the
> claimant's severe impairments by limiting her to light
> work . . . Moreover, the undersigned has also limited
> her to unskilled work low stress work, with frequent
> interaction with coworkers and supervisors, and
> occasional interact[ion] with the public, to fully
> accommodate her mental health symptomatology. The
> result is that the record as a whole does not support
> any greater limitations than those outlined.

(R. 322). In framing her hypothetical to the VE, the ALJ imposed

restrictions accounting for Plaintiff's mental limitations, and

specifically limited Plaintiff to light exertion, simple routine

tasks, and no complex tasks. (R. 358).

Considering Plaintiff's lymphedema, the ALJ found that

"[w]hile there were multiple examinations where the claimant had

swelling on one or both of her legs, these findings were not

consistent in that there were many examinations where she had no

swelling," and "examinations consistently noted good bilateral

radial pulses, no erythema and intact strength." (R. 320); see

(R. 1283, 1285-86, 1455, 1472, 1474-75, 1479-80, 1730, 2396, 2410-

11). The ALJ recognized Plaintiff's testimony that she uses a

machine to reduce her leg swelling, but observed that the record

only includes one reference to the machine. (R. 321) (citing R.

2550). The ALJ further noted that Plaintiff's medical provider

declined to complete paperwork for her excusing her from work on

the basis of her lymphedema because it was only stage 1. (R. 322)

(citing R. 1274, 1729). The ALJ then accounted for Plaintiff's

lymphedema in the RFC, and limited her to no more than occasional

46

pushing and pulling with lower extremities including foot controls, and provided environmental limitations. (R. 318, 323). When posing her hypothetical to the VE during the second hearing, the ALJ included these limitations. (R. 358, 395) ("[I]f the individual . . . was further reduced with regard to pushing and pulling of the lower extremities to only occasional, including foot controls, would that have any effect on those light jobs?").

As shown by the ALJ's detailed analysis of the evidence in the medical record, her RFC not only considered all of the evidence—both physical and mental symptoms—but also properly accounted for any impairments supported by the record. Accordingly, the undersigned finds that the ALJ performed the required function-by-function analysis and her RFC was supported by substantial evidence.

### 5. The ALJ Properly Considered Plaintiff's Testimony

Lastly, Plaintiff alleges that the ALJ failed to explain why her subjective allegations of disabling symptoms were inconsistent with the record. Pl.'s Br. (ECF No. 11, at 17–21). Plaintiff contends that the ALJ only provided a "blanket statement regarding Plaintiff's testimony," findings that it was "'not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.'" Id. (quoting R. 319).

To the extent Plaintiff contends that the ALJ erred in evaluating her credibility, the Court must give great deference to the ALJ's credibility determinations. Eldeco, Inc. v. N.L.R.B., 132 F.3d 1007, 1011 (4th Cir. 1997). "When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Id. (quoting NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). The Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)). Here, as the foregoing discussion of Plaintiff's other claims demonstrates, the ALJ performed the required analysis and articulated a number of reasons for not fully crediting Plaintiff's statements. See (R. 321) (reviewing the record and explaining that it "does not support the claimant's allegations"). There are no exceptional circumstances which would warrant disregarding the ALJ's credibility determination. Accordingly, the Court finds the ALJ properly evaluated Plaintiff's credibility.

## V.   RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court DENY Plaintiff's Motion for Summary Judgment, (ECF No. 10), and AFFIRM the decision of the Commissioner, (ECF No. 12).

## VI.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

June 20, 2024